IRVING E. ABELES and BENJAMIN KLEINMAN, Copartners Doing Business under the Firm Name and Style of SUCCESSFUL JUNIOR DRESS COMPANY, Plaintiffs, *v.* HARRY FRIEDMAN, as President of CLOAK, DRESS DRIVERS & HELPERS UNION, LOCAL 102, I. L. G. W. U., and BEN EVRY, as President, and PHILLIP KAPP, as Treasurer, of JOINT BOARD OF DRESS AND WAISTMAKERS' UNION OF GREATER NEW YORK, I. L. G. W. U., Defendants.

Supreme Court, Special Term, New York County, June 14, 1939.

*David F. Risik,* for motion for injunction and in opposition to motion to dismiss complaint.

*Emil Schlesinger* and *Abraham Schlesinger,* in opposition to motion for injunction and in support of motion to dismiss complaint.

SHIENTAG, J. This is a motion for an injunction *pendente lite* to restrain the picketing of, and other interference with, the business of the plaintiffs by the defendants, who are unions. There is a cross-motion to dismiss the complaint on the ground that it appears upon its face that a labor dispute is involved within the meaning of section 876-a of the Civil Practice Act and that there has been no compliance with the requirements of that section. The plaintiffs concede that they have failed to comply with the provisions of the section referred to but contend there is no labor controversy here involved. The issue is thus sharply drawn between the parties. So far as the application for an injunction *pendente lite* is concerned, the court considers not alone the complaint but the affidavits submitted on both sides. So far as the motion addressed to the sufficiency of the complaint is concerned, the court considers only the pleading.

I shall take up first the application for a temporary injunction. The complaint alleges that since the 1st day of October, 1938, the plaintiffs Irving E. Abeles and Benjamin Kleinman have been and still are copartners doing business under the firm name and style of Successful Junior Dress Company, conducting the business of jobbers in ladies' dresses at 101 West Thirty-seventh street, New York city. It sets forth the status of the defendants, who are officers, respectively, of the Cloak, Dress Drivers & Helpers Union, Local 102, of the International Ladies' Garment Workers' Union, and of the Joint Board of Dress and Waistmakers' Union of Greater New York, also affiliated with the International Ladies' Garment Workers' Union.

The complaint then goes on to allege that " since the inception of plaintiffs' business they have not employed and still do not employ any workers in or about their business and plaintiffs have done and performed and still do and perform all the work required in the operation of their said business without the aid of any workers whatsoever, except that of manufacturing cut piece goods into dresses and that of delivering said dresses to plaintiffs' customers; that the said manufacturing and delivering of dresses have been done for the plaintiffs by independent contractors, which contractors are paid by plaintiffs a certain fixed contract price for their services, and the said contractors have never been employees or workers of the plaintiffs; that the contractors are not situated in or upon the premises occupied by plaintiffs nor in or upon any premises in which the plaintiffs have any interest by lease, ownership, use or occupation, or in any other wise; that the plaintiffs are not members of any group or association of employers in their

line of industry, nor have they contracts, oral or written, with the defendant union or any other unions."

The complaint recites in detail the alleged wrongful picketing of their premises and interference with their business by the defendants; the alleged unlawful demand that the plaintiffs cease at once to do their own cutting and sample making upon the premises and employ members of the union to do that work; and that the trucking firms heretofore engaged in making deliveries for the plaintiffs ceased to do so by reason of threats and coercion by the defendants. The plaintiffs further complain that the pickets carry signs to the effect that the employees of the plaintiffs are on strike, when, in fact, it is contended that the plaintiffs have no employees.

The plaintiffs rely on the decision in *Thompson* v. *Boekhout* (273 N. Y. 390) in support of their contention that there is no labor dispute involved. The Court of Appeals in that case said: " The application of section 876-a of the Civil Practice Act is confined to injunctions in cases ' involving or growing out of a labor dispute.' The Legislature has in the same section defined ' labor disputes.' That definition makes clear the intent of the Legislature to subject injunctions issued in disputes involving or growing out of the relations of employer and employee to special regulations deemed appropriate to the nature of such disputes. Where the owner of a small business seeks to avoid ' labor disputes ' as defined in the statute, by running his business without any employees, an attempt to induce or coerce him to hire an employee or employees, upon terms and conditions satisfactory to persons associated in such attempted inducement or coercion is not a ' labor dispute ' within the letter or spirit of the statutory definition. We hold that the statute has no application in this case."

The defendants contend that the situation here presented differs in many important respects from that involved in the *Thompson* case, and that the instant case bears no resemblance to that type of case where the employers of a small business perform every act in connection with the commodity or the service which they sell.

It appears from the affidavits, and there is no substantial dispute as to these matters, that the Joint Board of Dress and Waistmakers' Union of Greater New York is affiliated with the International Ladies' Garment Workers' Union, a labor organization composed of 305 local labor unions in all parts of the United States, Canada and Puerto Rico, which together represent a combined membership of about 235,000 men and women in the different branches of the women's garment industry. The Joint Board is a delegated body composed of representatives of all local unions in the city of New York affiliated with the International Ladies' Garment

Workers' Union, the members of which are engaged in the dress industry. The function of the Joint Board is to transact the business of common interest to all such locals. The defendant Cloak, Dress Drivers & Helpers Union, Local 102, I. L. G. W. U., is affiliated with the Joint Board.

It further appears that the dress industry in the United States is centered in and about the city of New York and approximately more than 80,000 workers, a majority of whom are members of the defendants, are engaged at work within that territory. Prior to the organization of the International Ladies' Garment Workers' Union, those employed in the women's garment industry in the United States were compelled to work unreasonably long hours for inadequate pay, and in a large number of cases worked in shops and factories under conditions detrimental to their safety and health. Largely through the persistent efforts of the International Ladies' Garment Workers' Union and the various locals affiliated with it the workers in the women's garment industry have succeeded in substantially improving their conditions of work and in raising their standards of living; that they have, to a large extent, succeeded in abolishing the former excessive hours of labor; that they are receiving better pay and that the shops and factories in which they are employed have been made safe and sanitary; that these results have been accomplished largely through negotiations with employers in the industry, for the most part organized associations of employers, and, primarily, by means of collective agreements between the union and individual employers and associations of employers; that such collective agreements have been made to run for specified periods of time and have provided for wages to be paid to the workers in the various branches of the industry, their hours of labor, sanitary shop conditions and methods of adjusting disputes arising between employer and workers and for other essential conditions to govern the relations between employer and employees.

It further appears from the affidavit in opposition that some twenty years ago the manufacture of dresses was largely concentrated in "inside" shops operated by employers who were directly responsible both for manufacturing and for marketing the product and who dealt with labor directly; that thereafter certain employers discovered what they believed to be a method of avoiding unionization and evading all direct responsibility to their workers and the duty to maintain uniform labor standards. Pursuant to this method they abandoned their "inside" shops and had their garments produced by a new type of middleman in the industry who came to be known as a "contractor." The change was only an

apparent one. The manufacturer who had given up inside production continued in business; he originated the garment and marketed it, except that he turned over the process of manufacture to the " contractor," whom he supplied with the material and who made up the garment for him at a stipulated price.

The result was that there arose a new kind of manufacturer who came to be known in the industry as a " jobber." He ceased to have direct dealings with the workers; he was under no agreement with them as to wages, hours and other standards of labor and was not responsible to them for wages. All these obligations were shifted from him to the contractor, often a person without financial responsibility. It further appears that the system of " jobbing-contracting " rapidly increased and that the greater number of inside manufacturers became jobbers. A majority of the employees ceased to work for direct and responsible employers and were forced to deal with more or less irresponsible middlemen. This involved for the worker not only a general lowering of labor standards but also increased unemployment and uncertainty of tenure of employment. Under the collective agreement between the Joint Board and the association of inside manufacturers the workers' jobs were safe as long as they performed their duties properly; they could not be laid off or discharged arbitrarily. The jobber had no such obligation to the workers. He could withdraw his work from any contractor, with or without cause, and thus indirectly throw an entire shop of employees out of work.

The jobbers as a class competed with the inside manufacturers, and contractors were constantly engaged in fierce competition with each other for the work of jobbers. Such competition was based almost entirely on labor costs, each contractor trying to secure the maximum amount of work by offering to do it at a lower price, with the result that labor standards were depressed.

The union realized that the dress industry and the cloak, suit and skirt industry, which is kindred to the former, could not be stabilized unless the evils of the irresponsible system of " jobbing-contracting " were eliminated. The union was faced with the realization that the system had become definitely rooted in the women's garment industry and demanded that it be regulated and conducted in a manner that would not permit employers to evade their legitimate responsibilities to the workers in the industry. In the cloak, suit and skirt industry the union demanded, in 1924, that the jobber assume the same responsibility towards the workers that the inside manufacturer had. It was prepared to declare a general strike to achieve that purpose. Governor Alfred E. Smith intervened and averted a strike by appointing what became known

as the Governor's Advisory Commission in the cloak and suit industry. He directed them to make a complete, exhaustive survey of the industry.

The Commission, among other things, reported as follows:

" A decade ago the industry had risen out of the old sweatshop conditions in which much of the actual work had been done in tenement-house homes. Manufacturing had become concentrated in large ' inside shops ' under employers who were directly responsible both for manufacturing and for marketing the product. Since that time, however, there has been a gradual displacement of inside manufacturers by so-called jobbers. This has progressed to such a point that about three-fourths of the production now flows through the new jobbing-manufacturing system.

" This system has grown up partly as a device to escape labor responsibilities and partly as an adaptation to the new methods of retail buying.

" An inside manufacturer creates styles, employs a permanent complement of workers, and seeks, so far as possible, to get advance orders from the retailers, placing his chief emphasis upon quality of production. The jobber * * * instead is an indirect manufacturer. He purchases his materials and then farms out the production to an elastic and shifting group of small submanufacturers who follow his instructions as to style. His emphasis is on mass production and on selling finished garments from the racks."

The Commission found further: " In determining the relationship between jobber, submanufacturer, and workers we should be concerned not so much with the form as with the substance. By whatever name he may call himself, the jobber controls working conditions; he controls employment, and that element of control imposes upon him the responsibility that he shall so conduct his business that proper working standards may be upheld instead of undermined, and that employment may be stabilized instead of demoralized."

The Commission further recommended that those who employed the contracting system of production designate the contractors required by them and that they equitably distribute the work among the contractors so designated. In the collective agreements entered into with all the employer associations in New York city in 1936, the organized dress industry adopted the recommendation of the Governor's Commission and introduced the system now known as limitation or designation of contractors. Collective agreements were entered into between the Joint Board and jobbers in the industry and between the Joint Board and the association of inside

manufacturers and between the Joint Board and the association of contractors. Those collective agreements expired on January 31, 1939, and have since been renewed for another two years. From figures available at the office of the impartial chairman of the dress industry it appears that the contracting system of production is employed by seventy per cent of the industry and that the inside system of production is availed of by only thirty per cent.

Under the collective agreements in the dress industry the jobber is an indirect manufacturer and is directly responsible to the workers of his contractors' shops for wages earned by them on garments manufactured for his account. He is the virtual employer of these workers. Certain provisions of these agreements providing for contractor designation as a means of stabilizing the dress industry were held legal by Mr. Justice Levy in *Sainer* v. *Affiliated Dress Manufacturers, Inc.* (168 Misc. 319).

The relationship which exists between the jobber and the workers employed by his contractors has been recognized in the Unemployment Insurance Law of the State of New York, which is applicable to all jobbers, whether under collective agreement with the Joint Board or not. (Labor Law, § 502, subd. 3.)

It further appears in the opposing affidavit that the defendants have attempted to unionize the plaintiffs in order to bring them within the operation of the collective agreements in the industry, and that it was because of the refusal of the plaintiffs to participate in such collective agreements that the unions have called a strike.

It also appears from the affidavits, and substantially in the complaint itself, that the plaintiffs themselves do not manufacture the completed garment. One member of the firm cuts the piece goods and the other member creates the samples. Except for cutting and sample making all of the other operations, including those of draping, operating, finishing and pressing, are performed by the workers in the shop of the plaintiffs' contractor. After the dresses are completed by the contractor they are returned to the plaintiffs' premises from where they are shipped and delivered by the plaintiffs themselves and also by railway express companies and by independent dress truckmen.

The defendants contend that, under the circumstances, they have a right to strike against the plaintiffs to compel collective bargaining and to demand that the plaintiffs agree to each and every covenant contained in the collective agreements now in force in the industry; that they have a right to demand that the provisions for the designation of contractors and jobber responsibility, wages and settlement of piece rates, provided for in the collective agreements, be made applicable to the plaintiffs.

The defendants further contend that they have a right to demand that the plaintiffs live up to a provision contained in the collective agreements in the industry to the effect that no member of an employing firm, or foreman thereof, shall perform any work of the crafts that are enumerated, and that they would have a right to demand that the plaintiffs do all of their trucking of garments and of cut and uncut goods exclusively by union truckmen who are members of Local 102. In any event, the defendants contend that there is here involved a labor controversy or industrial dispute within the meaning of section 876-a of the Civil Practice Act and that the requirements of that section must be complied with before plaintiffs may obtain relief from the courts.

The question is whether or not the situation here involved is substantially the same as that which was presented to the Court of Appeals in the *Thompson* case. I am decidedly of the opinion that the two cases are entirely different and that the rule laid down in the *Thompson* case has no application here. In the *Thompson* case the plaintiff performed all of the work and services himself and did not require the aid of any other person to complete the work or service in whole or in part. In that case it appeared that the plaintiff operated a motion picture theatre in the city of Rochester. For some time prior to January, 1936, the plaintiff had employed the defendant Alvin Meyer as the projectionist in that theatre and on the date mentioned plaintiff, as a duly licensed projectionist, had taken over the duties formerly performed by that defendant; thereupon the defendant union had conspired to intimidate the plaintiff so that he would re-employ a projectionist under a contract prepared by the defendant union and had stationed pickets at the plaintiff's theatre.

In the instant case the plaintiffs merely cut piece goods and make the original sample. All of the other operations are performed by the workers in the shop of their contractor. In this case the plaintiffs are jobbers, as that term is used in the industry, namely, " a jobber is one who does not produce garments in his own factory but who has them made by contractors   *   *   *   and who may or may not employ cutters or sample makers." In this case the plaintiffs perform but a small part of the work necessary to produce and market their garments and rely on outside labor for the full and complete production of their product.

In the *Thompson* case the purpose of the defendant union was admittedly to compel the plaintiff to engage a member of the union to do all of the work required for the completed service. Here the purpose of the defendants was to obtain from the plaintiffs an agreement along the lines of the collective agreements prevailing

in the industry, providing, among other things, for jobber responsibility for the conditions of work in the contractor shops and conforming to the general standards accepted by the union and the vast majority of jobbers and other employers in the industry. In the *Thompson* case the effect on the industry was negligible. In this case the plaintiffs would be free to promote the kind of unbridled competition which flourished in the dress industry before the present regulatory measures were adopted.

It seems clear, in the light of the foregoing, that there is here involved a labor dispute or a labor controversy within the meaning of section 876-a of the Civil Practice Act. There concededly has been no attempt to comply with the provisions of that statute. Hence the application for a temporary injunction must be denied.

On the face of the complaint itself it appears, irrespective of the conclusions which the plaintiffs seek to attach, that they rely in large measure on the labor of others in connection with the production and marketing of their product. Under those circumstances the rule laid down in the *Thompson* case has no application. There is presented by the complaint itself an industrial controversy, a labor dispute within the meaning of section 876-a of the Civil Practice Act, and the complaint, which fails to allege compliance with the requirements of that section, is insufficient and must be dismissed.

There is one more point which may be considered. The plaintiffs urge that a provision in the collective agreement which the unions demand that they enter into, providing, in substance, that they, as the only two partners in their business, shall desist from cutting piece goods and making samples, but shall employ members of the union for that work, is arbitrary and unlawful. The court is not in a position to pass upon that question at this time. That issue may properly be raised and considered at the hearing or trial held after a complaint, which complies with the provisions of section 876-a of the Civil Practice Act, has been served. (See *Senn* v. *Tile Layers Union*, 301 U. S. 468.)

The application for a temporary injunction is denied, and the motion to dismiss the complaint is granted. Settle order.