In the Matter of the General Assignment for the Benefit of Creditors of Larry Jay, Inc., Assignor, to New York Credit Men's Adjustment Bureau, Inc., Respondent. Joint Board of Dress and Waistmakers' Union of Greater New York, Appellant.

First Department, March 26, 1957.

*Peter J. Schlesinger* of counsel ( *Emil Schlesinger* and *Max Bloom* with him on the brief; *Schlesinger & Bloom,* attorneys), for appellant.

*Murray Feigenbaum* of counsel (*Irving J. Seaver* with him on the brief; *Seaver & Feigenbaum,* attorneys), for respondent.

BOTEIN, J. At the turn of the century working and competitive conditions in the women's apparel industry were at a shocking level. Hordes of immigrants supplied an ever-deepening reservoir of cheap labor, and unrestrained jungle competition among manufacturers steadily depressed existing low wages. With the advent of an aggressive union in 1900, progress began to be made in organizing employees and improving conditions. To evade the policing efforts of the union and to secure the competitive advantage of substandard wages and working conditions, many manufacturers discontinued production inside their own factories. They contracted out all or part of the work to be performed, furnishing the contractors with the materials to be made into garments, the designs and specifications, and often subsidizing them by advancing the small capital required to start a contractor in business.

Operating on a marginal basis in a seasonal industry, going in and out of business with great frequency, these contractors posed a difficult and demoralizing problem to the union and to the better elements in the industry. As the United States Industrial Commission found: '' The contractor is an irresponsible go-between for the manufacturer, who is the original employer. He has no connection with the business interests of the manufacturer nor is his interest that of his help. His sphere is merely that of a middleman. He holds his own mainly because of this ability to get cheap labor, and is in reality merely the agent of the manufacturer for that purpose.'' (Reports of U. S. Ind. Comm., vol. XV, p. 321.)

With the emergence of the contracting system, the so-called jobber, who assigned out to contractors all or most of the manufacturing processes, attained a dominant position in the industry. So much so that by the 1920's a Special Advisory Commission appointed by then Governor Alfred E. Smith observed that:

" there has been a gradual displacement of inside manufacturers by so-called jobbers. This has progressed to such a point that about three-fourths of the production now flows through the new jobbing-manufacturing system. * * *

" By whatever name he may call himself, the jobber controls working conditions; he controls employment, and that element of control imposes upon him the responsibility that he shall so conduct his business that proper working standards may be upheld instead of undermined and that employment may be stabilized instead of demoralized."

These conditions hold true today. For a full appreciation of the issues involved in this matter it is essential that they be viewed against this historical background.

Larry Jay, Inc., was a jobber and a member of an association that had entered into a collective agreement with the union which was binding on every member of the association. By the terms of this collective agreement Larry Jay, Inc., was required to pay over to the union, for the union's health and welfare fund and its retirement funds, a stated percentage of the weekly wages of all workers employed in the shops of its contractors. These contractors were designated or registered by the jobber with the union. They worked exclusively for the jobber and were not permitted under the contract to work for anyone else.

Larry Jay, Inc., failed to make the fund payments for a number of months, and then filed an assignment for the benefit of creditors. It is not disputed that at the time of assignment there was due for the benefit of the two funds the sum of $2,195.39. Of this amount $978.03 had accrued within three months prior to the filing of the assignment. When the union submitted its verified proof of claim it asserted that this latter amount was a preferred claim under section 22 of the Debtor and Creditor Law, and that the balance was a general claim.

On its final accounting the assignee has opposed allowance of the claim for a preference, essentially on the ground that the workers for whose benefit the payments were required to be made were not employees of the assignor, but of its contractors. In disallowing a preference and denying any priority

status to the union's claim, Special Term adopted the assignee's contention.

Section 22 of the Debtor and Creditor Law, insofar as relevent here, reads as follows:

"In all distribution of assets under all assignments made in pursuance of this article, the wages or salaries actually owing to the employees of the assignor or assignors at the time of the execution of the assignment for services rendered within three months prior to the execution of the assignment, * * * shall be preferred before any other debt; * * *

"For the purposes of this section, wages or salaries shall mean all compensation and benefits payable by an employer to or for the account of the employee for personal services rendered by such employee. These shall specifically include but not be limited to salaries, overtime, vacation, holiday and severance pay; employer contributions to or payments of insurance or welfare benefits; employer contributions to pension or annuity funds; and any other moneys properly due or payable for services rendered by such employee."

The definition of wages was added to section 22, and to section 71 of the Stock Corporation Law, in 1952 (L. 1952, ch. 794) to bring within the ambit of the statutory term "wages or salaries" certain peripheral benefits, such as the fund payments involved herein, that had theretofore been excluded (*Matter of Hollywood Commissary*, 195 Misc. 441). Hence, the assignor in this case, by expressly undertaking to make the fund payments, obligated itself to pay directly a portion of the "wages or salaries" of the workers in its contractors' shops. The only issue, then, is whether persons working in the shops of the assignor's contractors may be regarded as employees of the assignor, within the contemplation of section 22.

Thus, the history of the labor struggles in the garment industry over the past half-century becomes important for the light that it sheds on the origin of this unique relationship between jobber and contractor. In *Abeles* v. *Friedman* (171 Misc. 1042) Justice SHIENTAG portrayed the union's struggle to hold the jobber to a measure of responsibility for working and wage conditions in the shops of his contractors.

The Legislature, when intent on protecting the employee, has not hesitated to impose statutory liability upon persons who do not occupy the conventional relationship of employers, and who by legal norms exercise none or few of the controls or supervision through which the master-servant role is spelled out. For example, subdivision 7 of section 560 of the Labor Law

reads as follows: " Whenever one employer contracts with a second employer for any work which is part of the first employer's usual trade, occupation, profession or enterprise, the first employer shall be liable for any contributions otherwise payable by the second employer, based upon wages paid in respect to such work, unless the second employer is free to do business with anyone who may wish to contract with him. Contributions so paid by the first employer on behalf of the second employer shall be deemed paid by the second employer. If the first employer fails to pay, on the date prescribed by the commissioner, contributions due on wages paid by the second employer, the commissioner may collect such deficiency from the second employer."

This section evinces a legislative intent to look first and primarily to the financially secure principal (who would be the jobber in the garment industry) for payment of unemployment insurance taxes, rather than to the irresponsible and evanescent contractor. Such a formula for taxation is probably feasible only when the contractor is not "free to do business with anyone" other than his principal. Only then will the principal be in a position to budget his liability or later apportion his payments in ratio to the benefits he received from the contractor's workers, as they will be working exclusively in his behalf. It is apparent that the Legislature was not so concerned with the legal technicalities of the employer-employee relationship as it was with finding the most responsible party within the boundaries of the principal-contractor-employee complex. Clearly, the paramount policy of the Legislature was to protect the employee.

Similarly, in enacting section 22 of the Debtor and Creditor Law, a statute designed to secure and prefer an employee's wages, it must be assumed that the Legislature's major concern was in preserving to the worker first call on some reasonable portion of the employer-assignor's assets that reflect in part at least the value of the employee's work product.

" The purpose of the act is that the debts of the corporation for the wages of employees, including in the designation all who in common understanding held that relation to the corporation should be the first charge on the assets, and that business debts should be postponed thereto " (*Palmer* v. *Van Santvoord,* 153 N. Y. 612, 618). The Legislature did not go so far as it did in subdivision 7 of section 560 of the Labor Law, quoted above, where it specifically defined the assignor or jobber in the labor triangle presented on this appeal as the employer who would be primarily liable for unemployment insurance

taxes. But by the same token, in amending section 22, the Legislature did not restrict its definition of an employer to one who enjoyed the status of the master according to substantive law concepts. Since there is no explicit limitation of the preference to the assets of the direct or conventional employer, the preference should not be denied when a party assuming part of the responsibilities of an employer expressly agrees to pay the wages which were owing to the employees at the time of the filing of the assignment.

In defining the term " wages " the Court of Appeals has said, " the sense in which it is used in a given statute depends not only upon the wording of the statute but upon the purpose of the law as well " (*People* v. *Vetri*, 309 N. Y. 401, 407). And similarly we must look to the purpose of section 22 to determine the sense in which the word " employer " is used. When rigid application of literal definitions or traditional tests of the employer-employee relationship would frustrate the statutory purposes, the courts have not hesitated to disregard the absence of accepted elements and probe for the realities of the situation. It has thus been held that those hired and paid by one person may nevertheless under certain circumstances be considered the actual employees of another (*Standard Oil Co.* v. *Anderson*, 212 U. S. 215; *Miller* v. *North Hudson Contr. Co.*, 166 App. Div. 348; *Green* v. *McMullen, Snare & Triest*, 177 App. Div. 771). In the latter case the defendant was held to be the employer of truck drivers supplied by a contractor, even though the defendant did not hire or fire such drivers or pay their wages directly. And in *Matter of Morton* (284 N. Y. 167, 173) the Court of Appeals said: " From the nature of the problem, the degree of control which must be reserved by the employer in order to create the employer-employee relationship cannot be stated in terms of mathematical precision, and various aspects of the relationship may be considered in arriving at the conclusion in a particular case."

It is not the traditional law of master and servant that inspires statutes of this nature, but a very real and practical legislative concern that the employer discharge his social and economic obligations. A jobber's obligations to employees flow from his status; his status is moulded by the economic fabric of the women's garment industry, and is largely reflected in the terms of the collective agreement. We must look to the economic and contractual coupling of jobber and contractor to determine the jobber's statutory responsibility.

Among other things, we ask whether the jobber obtained the same type of direct, ascertainable benefit from the work product

of these employees as did the contractor. If so, would a preference under section 22 for the unpaid wages that the jobber had agreed to pay work to the disadvantage of general creditors any more than if the contractor had undertaken to pay these wages?

The following recital from the agreement reflects the unity of jobber and contractor: " The parties hereto acknowledge that each member of the Association and his contractors who manufacture garments or perform work for him or with whom he otherwise deals are closely allied and have a close unity of interest with each other in the manufacture of such garments, and that, in any labor dispute, to the extent of any work performed on such garments, a member of the Association and his contractors are not ' neutrals ' with respect to each other but are jointly engaged in an integrated production effort."

Not only must the contractor work exclusively for the jobber, and be registered with an administrative board established under the agreement, but no additional contractor may be used by the jobber without the approval of that board. As contrasted with his direct responsibility for fund payments, the jobber is secondarily responsible, as guarantor, to the employees of his contractor for the payment of one full week and two days of their wages in the event of default in such payment by the contractor. Even contemplated in the agreement would appear to be the possibility that the jobber and contractor might contract for direct payment of wages by the jobber to the contractor's workers. There is a provision for penalties in the event of " underpayment made by a member of the Association to the contractor *or the workers* " (italics supplied).

The payment of the wages in the form of fund contributions was the sole and direct obligation of the jobber. In the event of default in payment by the jobber, there could be no recourse to the contractor. This aspect of the relationship distinguishes the instant case from *Matter of Ageloff* (40 F. Supp. 369). In the *Ageloff* case the motion of alleged employees for priorities under paragraph (2) of subdivision a of section 64 of the Bankruptcy Act (U. S. Code, tit. 11, § 104, subd. a, par. [2]) was denied because of the fact that the bankrupt manufacturer was a guarantor of the wages and his liability was stated to be a secondary one. If the preference is denied here, the employees, as general creditors, will receive only a fraction of their unpaid wages, since they cannot look to the contractor.

Through the bridge of the contracting device, the employees in the contractor's shop worked directly and exclusively for the jobber. The latter received the full traceable benefit of

their services, and their work product was reflected as completely in the assets that the jobber assigned for the benefit of creditors as though these employees had worked directly in its shop, under its immediate supervision. The jobber agreed to pay their wages, and it could and should have made prudent provision for such payments. If the jobber had not undertaken to make the payments, they would perforce have been assumed by the contractor. In that event the price charged by the contractor to the jobber for his services would have necessarily been increased; and the assets which the jobber turned over to the assignor for the benefit of creditors would most likely have been decreased proportionately.

Upon argument the attorney for the respondent assignee agreed to submit the appeal upon the broad issue as to whether the persons employed in the contractors' shops should be regarded as employees of the assignor within the meaning of section 22; and he stated that he did not wish the matter remanded to Special Term to take proof as to the allocation of the union's claim among the several workers, although he had raised the point in his brief.

We find, that within the contemplation of section 22, the assignor was the employer of those persons who worked in its contractors' shops; and it expressly contracted to pay directly that portion of the workers' wages which constituted fund contributions. Accordingly, the order appealed from should be modified by allowing the claim of the joint fund as a preferred claim to the extent of $978.03.

PECK, P. J. (dissenting). There may be good reason why the law should be what the penetrating opinion of the majority conceives it to be. This could easily be accomplished by appropriate amendment to the statute (Debtor and Creditor Law, § 22). I am unable to agree, however, that the employees of the contractors can be considered "employees" of the assignor under the present wording of the statute.

Not only am I unable to give that legal construction to the word "employees" as used in the statute, but it seems to me that such a construction would run contrary to the actual employer-employee relationship which existed in this case, which the contract between the parties recognized and in reference to which they contracted. To a limited extent of a period of one week and two days, on certain conditions, the assignor was made answerable for default of the contractors in paying wages payable by the contractors. This is clear recognition of the fact that the workmen of the contractors were their employees and not the assignor's employees.

The language of the statute, assimilating contributions for welfare benefits to "wages", as a matter of definition for the purposes of the statute, will not serve as a bootstrap to lift the contractors' employees into the category of the assignor's employees. While it may be said in statutory terms that the assignor obligated itself to pay a portion of the "wages" of the workers in the contractors' shops, the actuality in terms of the contract between the parties, under which the present claim is prosecuted, is that the contributions to be made by the assignor to the welfare fund were *not* to be deemed "wages". It is to be noted also that when section 22 of the Debtor and Creditor Law was amended in 1952 to include a variety of fringe benefits in the definition of "wages" for the purposes of the statute, no change was made in the definition of an "employer" or "employees". It is the embrace of the terms "employer" and "employees" which is the crux of this case rather than the embrace of the concept of "wages".

There are many aspects and incidents of the employer-employee relationship. None existed here. The particular extraordinary engagement made by the assignor to make contributions to the welfare fund for the benefit of the contractors' employees will not support a conclusion or characterization that the assignor was the employer in the absence of all the usual tests, aspects and incidents of the employer-employee relationship. Cases in which an employee of one person has been considered *ad hoc* the employee of another person do not advance the argument of claimant here (*Standard Oil Co.* v. *Anderson*, 212 U. S. 215; *Miller* v. *North Hudson Contr. Co.*, 166 App. Div. 348; *Green* v. *McMullen, Snare & Triest*, 177 App. Div. 771). There is no *ad hoc* feature in this case. The claim is and must be that the contractors' employees were the assignor's employees inherently and constantly. In my view, that cannot be said in this case either as a matter of fact or law.

We must be mindful of the fact that the statute involved in this case is of much broader coverage than the garment industry with its peculiar manufacturer-jobber-contractor relationship. It is industry-wide in its application. There are many industries where subcontractors are dependent in different ways and in various degrees upon contractors. But it has not been suggested until now that such dependence makes the employees of the subcontractor the employees of the contractor. Section 22 of the Debtor and Creditor Law dates back in its origin to 1877. No change has been made in the pertinent wording affecting the definition of "employees". While changing conditions may bear on the existence of an employer-employee rela-

tionship, the test by current concepts remains the same, namely who in "common understanding" are included in the designation (*Matter of Kimberly*, 37 App. Div. 106, 110). In common understanding by any ordinary test the employees of the contractors here are not employees of the assignor.

I fear that the majority's enlarged interpretation of the word "employees" in this statute will open to confusion and contention what has been clear and certain. The interpretation influenced by the circumstances of one industry and perhaps one union in that industry can have untold disturbing consequences. If a change is to be made in the definition or interpretation of "employees" in this statute, it seems to me that it should be made on the basis of legislative consideration and determination. The recent decision of the United States Court of Appeals for the Second Circuit in *Local 140 Security Fund* v. *Hack* (242 F. 2d 375), while not exactly in point, indicates the reason for limiting preferences as between creditors to those specified by statute and why the preferences should not be extended by judicial interpretation.

Subdivision 7 of section 560 of the Labor Law is referred to in the majority opinion. But its significance lies, I believe, not in indicating any enlarged legislative concept of the employer-employee relationship, but rather in revealing that when the Legislature wishes to impose or extend statutory liabilities in this area beyond the conventional employer-employee relationship, it proceeds consciously and deliberately by appropriate statutory change. The Legislature has not seen fit in all its consideration, reconsideration and amendment of section 22 of the Debtor and Creditor Law to make the change made by the court in this case. I do not think that the change should be made in this way or that the historic and constant wording of the statute will support it. Therefore, I dissent and vote to affirm.

RABIN and FRANK, JJ., concur with BOTEIN, J.; PECK, P. J., dissents and votes to affirm in opinion, in which BREITEL, J., concurs.

Order modified by allowing the claim of the joint fund as a preferred claim to the extent of $978.03 and, as so modified affirmed, with $20 costs and disbursements to the appellant. Settle order on notice.