**Leo GREENSTEIN and Harvey Good, Plaintiffs,**

v.

**NATIONAL SKIRT & SPORTSWEAR ASSOCIATION, INC., International Ladies' Garment Workers' Union, Joint Board of Cloak, Suit, Skirt and Reefer Makers' Union and Skirt Makers' Union, Local No. 23, ILGWU., Defendants.**

United States District Court
S. D. New York.
Nov. 9, 1959.

Ruben Schwartz, New York City, for plaintiffs.

Abraham Schlesinger, New York City, for defendant Skirt Makers' Union Local No. 23, ILGWU.

Morris P. Glushien, New York City (Max Zimny and Peter J. Schlesinger, New York City, of counsel), for defendant International Ladies' Garment Workers' Union.

WEINFELD, District Judge.

Plaintiffs move for a preliminary injunction to stay an arbitration hearing before the Impartial Chairman designated in a collective bargaining agreement between the defendant National Skirt and Sportswear Association, representing employers, hereafter called "the Association", and the three union defendants, hereafter collectively referred to as "the Union." The membership of the Association is composed of jobbers and manufacturers of ladies' sportswear garments. The plaintiffs, manufacturers, have been members of the Association since 1951 and as such are bound by the terms, and entitled to the benefits, of the agreement between it and the Union.

The agreement, which has been in effect since June 1958, expires in May 1961 and is basically a renewal of prior agreements, the first of which was entered into in 1933. It provides against strikes and lockouts, and also contains a specified procedure for the resolution of disputes and grievances. In the event disputes are not resolved at the final stage of the grievance procedure they are referred to, and determined by the Impartial Chairman, who is granted power to conduct hearings and whose decision shall be final.

Plaintiffs operate what is known as an "inside shop" where they manufacture only a part of the garments they sell and distribute. The balance of their output is produced by sub-manufacturers and contractors to whom plaintiffs deliver goods, either uncut or cut, for processing into garments.

On October 2, 1959, the Impartial Chairman notified the plaintiffs that the union defendant Local 23 had filed a complaint charging them with violations of the agreement and that a hearing thereon would be held on October 26, 1959. The alleged violations were:

(1) failure to make payments to designated Health and Welfare, Retirement, and Severance Funds, hereinafter referred to as "welfare funds";

(2) manufacturing of the garments with non-union, non-designated and non-registered contractors;

(3) failure to settle piece rates of garments produced by non-union, non-designated and non-registered contractors.

The complaint also charged that the plaintiffs maintained more than one set of books to conceal violations and to evade provisions of the agreement and failed to submit all their books and records for examination by a union representative.

Three days before the scheduled hearing on these charges, the plaintiffs commenced this action, naming their own Association and the Union as defendants. They charge that certain provisions of the collective bargaining agreement violate the Labor Management Relations Act of 1947, et seq., and the Sherman Act, and consequently are unenforceable. Upon the filing of the complaint, the plaintiffs moved for a preliminary injunction to stay the hearing before the Impartial Chairman, claiming that their alleged violations are based upon the provisions of the agreement which the suit seeks to invalidate, and that if the proposed hearing were held the plaintiffs would be deprived of "our rights and our suit rendered valueless."

Plaintiffs, to obtain the drastic relief of staying the arbitration pro-

cedure which has been applied in this industry under the present and prior agreements for more than twenty-five years, must show: (1) a likelihood that their attack upon the alleged illegal provisions will be sustained upon a hearing on the merits,[1] and (2) even if so, that irreparable injury will result unless an immediate restraint is granted.[2]

Thus we first consider the substance of the charges of illegality. These break down into an attack, first, on the welfare fund provisions, and, second, on other clauses of the contract which allegedly restrict competition and result in price-fixing.

### Welfare Fund Provisions

The agreement provides for employer contributions to three separate funds, Health and Welfare, Retirement, and Severance. The payments are based upon a percentage of weekly wages of the workers employed by a manufacturer in his inside shop, if he maintains one, and, in addition, a percentage of the gross amount paid by him to each of his contractors and sub-manufacturers for labor, overhead and services. The agreement contemplates that work on garments, whether by employees of Association members or outside contractors, will be performed in union shops. However, it appears that plaintiffs, contrary to the agreement, placed work with non-union contractors and that the welfare fund payments made by them included sums computed on amounts paid to non-union contractors for labor, overhead and services.

With respect to such payments the plaintiffs allege violation of section 302 (a) and (b) of the Taft-Hartley Act, Labor Management Relations Act of 1947.[3] The first cause of action seeks to recover payments already made, based upon such non-union employees' wages, and the third cause of action seeks to enjoin the future collection of payments.

Section 302(a) and (b) of the Act makes it unlawful for any employer to make any payment to the representative of his employees, and also for any such representative to receive any payment. Payments to welfare funds for the benefit of employees are not within the prohibition.[4] The plaintiffs contend that the payments already made and those which the defendants now seek to compel them to make are not to a fund exempted from the ban of section 302.

The gist of the complaint is that insofar as the payments to the funds were based on amounts paid to non-union contractors they were "not paid for the benefit of the employees of the plaintiff or the employees of its contractors, nor were said funds received by the defendants for the benefit of any employees of the plaintiff or employees of the plaintiffs'[5] contractors"; that the defendants received the said sums although the employees on whose behalf such payments were made are entitled to no benefit from the funds.

Perhaps in anticipation that some Association members might honor the agreement more in the breach than in observance, the parties agreed that if any payments to the welfare funds are computed upon garments manufactured for an Association member by non-union contractors in violation of the agreement, such portion

> "shall be deemed paid to Local # 23 solely as liquidated damages for such violation and shall not be deemed payments made for and on behalf of the Health and Welfare Fund

1. Anderson-Friberg, Inc. v. Justin R. Clary & Son, D.C.S.D.N.Y.1951, 98 F.Supp. 75; Williams v. Transcontinental Gas Pipe Line Corp., D.C.W.D.S.C.1950, 89 F.Supp. 485.

2. United States v. Adler's Creamery, Inc., 2 Cir., 1939, 107 F.2d 987, certiorari denied 1940, 311 U.S. 657, 61 S.Ct. 12, 85 L.Ed. 421.

3. 29 U.S.C.A. § 186(a), (b).

4. 29 U.S.C.A. § 186(c) (5).

5. The complaint speaks sometimes of "plaintiff" in the singular, and sometimes of "plaintiffs" in the plural. In fact there are two plaintiffs, partners doing business as "Trio Togs."

\* \* \*. All damages paid hereunder to Local # 23 shall be turned over by it to a Fund to be established by the International and to be administered by a Board of Trustees, composed of representatives of the International and employers in the women's garment industry and presided over by an impartial umpire, the Fund to have such beneficent purposes as the Board of Trustees shall determine and which shall be in the interests of the workers covered by this and similar collective agreements entered into by the International or its affiliates with employer associations." [5a]

The precise issue revolves about this clause. Plaintiffs' contention with reference thereto has been somewhat obscured by conflicting statements of the opposing parties.[6] The question appears to be whether a fund based on liquidated damage payments resulting from an Association member's breach of the agreement, to be administered as specified above, is within the permissible exemption of section 302(c) (5). The question is so narrowed for the reason that if plaintiffs had complied with the agreement and all garments were manufactured in union shops, whether inside or contractors' shops, no issue would arise, since in that circumstance the payments for the three designated welfare funds would be based upon wages paid to employees of union shops, and the benefits of the fund would extend to all employees of a covered employer, regardless of whether such employees were or were not union members. The fund now under attack, derived from the liquidated damage payments, comes into being only in consequence of violations of the agreement by an Association member.

Section 302(c) (5) of the Labor Management Relations Act exempts payments " \* \* \* to a trust fund established by such [union] representative, for the sole and exclusive benefit of the employees of such employer, \* \* \* Provided, That \* \* \* such payments are held in trust \* \* \* for the benefit of employees, their families and dependents" [7] for specified purposes such as medical, hospital care, retirement and the like. The plaintiffs contend that the fund (based upon the liquidated damage payments) does not have the specificity demanded by the exemption provision of section 302. The Union counters, and with substance, that the basic purpose of section 302(c) (5) was to assure that welfare funds would not be diverted from their intended purpose and that they would be held in trust for the benefit of employees within the broad framework of the general specifications enumerated therein; further that the section does not purport to require in haec verba clauses to be incorporated into trust agreements governing such funds so long as the general trust purposes are observed. It urges that Congress sought to eliminate possible abuses by union officials if welfare funds were left to their sole control.[8]

In the instant case, the fund, although derived from liquidated damages payable to the Union, does not rest in its sole control; on the contrary, the contract directs that the fund shall be administered by a Board of Trustees composed of union representatives and employer representatives, presided over by an impartial umpire, and it shall have such "beneficent purposes" as the Board shall determine. It is provided that such beneficent purposes "shall be in the interests of the workers covered by this and similar collective agreements entered into by the

---

5a. A similar provision applies to the Retirement and Severance Funds.

6. Originally the plaintiffs' moving papers (and the defendants' answering affidavits) centered their contentions upon the three designated funds. Following a further hearing before the Court, plaintiffs' position was clarified and no challenge is now made with respect to these three funds.

It is for this reason that plaintiffs' counsel, among other matters, urges that Anzio Frocks, Inc. v. Joint Board Dress and Waistmakers' Union, D.C.S.D.N.Y. 1959, 176 F.Supp. 176, is inapplicable.

7. 29 U.S.C.A. § 186(c) (5).

8. Cf. Arroyo v. United States, 1959, 359 U.S. 419, 425, 79 S.Ct. 864, 3 L.Ed.2d 915.

International or its affiliates with employer associations." The papers submitted on this motion do not show just how this fund has been set up, if at all, and what its specific trust provisions are. If it parallels the three designated welfare funds in terms of benefits it could not successfully be challenged.

On the other hand, if the payments go into the three designated funds, there can be no question of compliance with the conditions of section 302(c) (5) insofar as trust purposes are concerned, since they are for the sole and exclusive benefit of employees, their families and dependents. Notwithstanding, the plaintiffs argue that the payments, insofar as they are computed upon wages and other sums paid by a manufacturer to non-union contractors, are illegal because the benefits of the funds are not extended to employees of such non-union contractors.

The Union responds that the Act does not specify how monies paid by an employer into a welfare fund are to be computed; that this is a matter to be decided between the employer and the union representatives; that in the instant case they agreed that the payments were to be measured by a percentage of the inside manufacturer's payroll combined with a percentage of payments made by him to his contractor for labor, overhead and services. It urges that this method of computation was adopted to measure the Association members' liability for payment into the fund; that the method has no relationship to which employees are eligible for fund benefits; that eligibility is determined by other provisions of the collective bargaining agreement and the by-laws and rules and regulations which govern the administration of the welfare funds. The Union emphasizes that under the agreement no employee has any right or claim to any payment made by an employer to the funds; that funds are pooled and the right of an employee to receive benefits therein follows from his employment by a covered employer—that is—an employer, whether manufacturer, jobber or contractor, who has entered into contractual relations with the Union. In sum, it urges that the method of computation for determining an Association member's liability to the fund is entirely legal and does not contravene section 302. That its position is one of substance cannot be gainsaid.

As to Sheet Metal Contractors Association v. Sheet Metal Workers International Association,[9] relied upon by the plaintiffs to support their charge of illegality, it appears that there the trust purposes of the fund were not in accord with the conditions imposed by section 302(c) (5) but, on the contrary, use of the fund was permitted for public relations and other activities which went beyond specific benefits enumerated in the exemption clause.

The Union makes a further argument that the payments to the fund, insofar as they reflect amounts computed upon garments manufactured under non-union auspices, are specifically agreed upon as liquidated damages. Accordingly, they urge that such payments come within the protection of a further exception which permits payments by an employer "* * * in * * * adjustment, settlement or release of any claim * * *."[10] This contention also offers substantial challenge to plaintiffs' attack upon the validity of the fund.

Defendants advance other arguments in opposition to plaintiffs' view that section 302 requires condemnation of the fund in question, but it is unnecessary to consider these, since sufficient has been shown to raise a substantial doubt of the likelihood that plaintiffs will succeed on this issue. It should be noted, however, perhaps unnecessarily, that the Court makes no definitive determination on this and other contentions of the plaintiffs with respect to the asserted causes of action.

Alleged Price-Fixing, Restraint of Trade and Monopolization of Trade

---

9. 9 Cir., 1957, 248 F.2d 307, certiorari denied 1958, 355 U.S. 924, 78 S.Ct. 367, 2 L.Ed.2d 354.

10. 29 U.S.C.A. § 186(c) (2).

The plaintiffs' second cause of action challenges other provisions of the agreement, the enforcement of which, they allege, constitutes an unlawful combination and conspiracy by the defendants to control the manufacture and sale of garments made by the plaintiffs and others in violation of the Sherman Antitrust Act. In end result, the basic charge is price-fixing and unreasonable restraint of trade.

The significance of the provisions under attack and the illegal results attributed to their enforcement can better be appreciated against the background of conditions in this industry which have been recognized as sui generis.[11] The barest outline will suffice for the purposes of this motion.

Manufacturers such as the plaintiffs produce only a portion of garments in their own shops, so-called "inside shops"; the balance are manufactured away from their premises by outside sub-manufacturers or contractors whose employees work on the manufacturers' material, either cut or uncut. Presently more than 80% of the workers in this industry work in the shops of contractors. This is usually referred to as the "outside system of production." It has its genesis in a fiercely competitive struggle by manufacturers of garments at the turn of the century which caught the workers in the industry, at that time mostly recently arrived immigrants, in between, depressed their wages and resulted in intolerable working conditions. The defendant international union was then organized and waged an aggressive campaign to unionize the industry and to better conditions. In an effort to avoid unionization, and to evade all direct responsibility to production employees, manufacturers who operated inside shops, the then prevalent method of manufacturing and marketing of garments, abandoned their shops. Instead they contracted out all or a part of the work to outside contractors whose employees worked on materials supplied by the manufacturers. And so the outside system of production came into being. These contractors generally were marginal operators without financial resources and again the worker was exploited.

The abandonment by a manufacturer of direct production on his own premises also brought into being the "jobber". The jobber had no direct dealing with employees, was not responsible to them for wages, and was unconcerned with hours and adequate standards. He also engaged contractors for the production of his garments and by this method shifted all reponsibility for employee conditions to the contractor. The jobber as a class competed with the inside manufacturer. The contractors were in fierce competition with one another for the patronage of jobbers and inside manufacturers. The essential basis of this intense competition was reduced labor costs. The brunt of this economic rivalry was borne by the workers and reflected itself in depressed wages and substandard labor conditions.[12] The Union, as well as enlightened leaders in the industry, sought to correct the demoralizing effects upon employees brought about by the jobber-contractor system. The problem of the industry, also one of public concern, was the subject of investigations by public agencies and commissions which recommended either legislation or remedial programs.[13]

In the light of the historical conditions which led to the contractor system and

---

11. 95 Cong.Rec. 8709 (1949).

12. Report of Advisory Commission in the Cloak and Suit Industry appointed by Governor Alfred E. Smith of New York State in 1924. A very exhaustive and illuminating analysis of practices and conditions in the industry is set forth by the late Mr. Justice Shientag, who was a member of the Commission, in Abeles v. Friedman, 1939, 171 Misc. 1042, 14 N.Y.S. 2d 252.

13. Reports of the United States Industrial Commission, volume XV; Report of Advisory Commission, note 12 supra. See also In re Larry Jay, Inc., 1957, 3 A.D. 2d 386, 160 N.Y.S.2d 790, affirmed without opinion, 1958, 4 N.Y.2d 912, 151 N.E. 2d 93; Abeles v. Friedman, 1939, 171 Misc. 1042, 14 N.Y.S.2d 252.

its attendant evils, the employees of the entire industry were the subject of Union concern and all bargaining agreements through the years have reflected not only a purpose to correct conditions, but to prevent their recurrence.[14] It is against this background that the various clauses under attack must be considered.

The current agreement provides that for the purpose of eliminating substandard labor conditions, to protect the employment opportunities of the workers covered by the agreement, and to secure enforcement of the provisions of the agreement, every Association member agrees to

(1) maintain a union shop if he manufactures on his own premises, and if not,

(2) he will designate contractors or submanufacturers who conduct union shops and have entered into contractual relationships with the Joint Board and/or the Union,

(3) pay to contractors or sub-contractors an amount at least sufficient to pay their workers the wages and earnings provided for in the agreement, and in addition a reasonable amount to cover overhead.

The complaint alleges that these provisions are designed as part of a combination or conspiracy by the defendants to restrain trade, to fix prices and to create a monopoly in the garment industry. The basis of the complaint is not clearly spelled out in the affidavits submitted by plaintiffs in support of their motion and to the extent there is reference thereto, it is of a general conclusory nature. Evidently, the claim of illegal restraint of trade rests upon items 1 and 2 noted above. However, these are clearly designed to secure union shop conditions in the industry since 80% of production is carried on in shops not owned by Association members. The manufacturer and the contractor, though functioning, theoretically, as separate entities, are engaged in an integrated production effort.[15] The unique nature of this phase of the garment industry was recognized by the principal sponsor of the Taft-Hartley Act who indicated that the secondary boycott features of the Act were not intended to apply to the manufacturer-contractor relationship in this industry.[16]

The plaintiffs urge that although they and other Association members are free to designate their contractors, this is ineffectual unless the Union Joint Board approves. No instance, however, is stated as to any claimed refusal to give approval to designations nor is any claim made that there has been an arbitrary refusal in order to further an illegal purpose.

Item 3 above is calculated to assure that the wage levels established by the agreement are maintained. However,

---

14. Indeed the current agreement provides: "Since the ultimate source of employment and wages paid to employees of contractors * * * is the employer * * * the parties * * * acknowledge that a member of the Association who supplies work to contractors * * * is directly concerned with the payment of the wages of the workers employed by his contractors * * *." Paragraph Seventh (e) at p. 10.

15. This aspect of the industry is expressly acknowledged in the current agreement. It provides that the parties acknowledge "that each member of the Association and his contractors * * * who manufacture garments * * * for him * * * are closely allied and have a close unity of interest with each other in the manufacture of such garments, and that in any labor dispute, to the extent of any work performed on such garments, a member of the Association and his contractors * * * are not 'neutrals' * * * but are jointly engaged in an integrated production effort." Paragraph Sixth (b) at p. 7.

16. 95 Cong.Rec. 8709 (1949). The recently enacted Labor-Management Reporting and Disclosure Act of 1959, Pub.L. No. 86-257, 86th Cong., § 704 confirms this view. It contains a specific amendment to section 8(b) (4) but makes the secondary boycott provisions inapplicable to "persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry * * *."

plaintiffs contend that those provisions have been subverted for price-fixing purposes. Their contention rests upon the requirement that the manufacturer pay contractors, not only amounts sufficient to pay the workers the wages stipulated in the agreement, but in addition, "a reasonable amount * * * to cover his [the contractor's] overhead which each member of the Association shall settle separately with his contractors * * *." There is no averment either in the complaint or the affidavits as to any specific price-fixing activity between the Association and the Union. Evidently relying on the overhead payment provision, the plaintiffs contend that this in effect requires the contractor to sell his garments at the same level of prices as all other contractors. However, overhead payments obviously would vary from contractor to contractor and just how this provision would result in price-fixing on a conspiratorial basis is not made clear. On the other hand, the Union contends that the overhead provision was demanded to insure that no part of the labor costs paid to a contractor would be diverted by him for overhead or other non-labor costs.

The plaintiffs seek to bring their claim within the holdings of Allen Bradley Co. v. Local Union No. 3,[17] and United Brotherhood of Carpenters v. United States,[18] but their papers are barren of any evidentiary fact to support the charge of conspiracy between the Union and the Association. Evidently recognizing this, and to bolster their unsubstantiated charges, plaintiffs have submitted a copy of an indictment returned against another union, a member of the International herein, based upon a collective bargaining agreement and practices thereunder which they say closely parallel those in this case. On a motion for an injunction, facts, and not charges, are required if a party is to prevail. The Court has not considered the indictment relevant on this motion. An indictment is not a substitute for evidence. Neither the Association defendant nor the defendant unions are the subject of any indictment. In any event, an indictment is an accusation and has no probative value. A union, no less than a corporation, is entitled to the same presumption of innocence that protects individuals.[19]

The Union urges that the various provisions of the agreement under attack were designed in light of the past practices and abuses which victimized the workers, whether engaged by inside manufacturers, jobbers, or outside contractors, to assure their permanent elimination and to assure further that the manufacturer and jobber would not divorce themselves from responsibility for the wages, working conditions and welfare of the worker who produces the product which they sell and market. These provisions, says the Union, are the result of hard bargaining, reflect its independent effort to protect its members by insuring a fair wage, maintenance of adequate standards of work and prevention of a recurrence of past demoralizing practices. If these protective clauses were demanded and obtained by the Union, as they assert, as a matter of independent action in furthering the welfare of the employees they represent, then the Allen Bradley case, which was predicated on joint and conspiratorial action between the employer and the union, is inapposite. Only if plaintiffs can establish that the attacked clauses were the result of, or used to further, a conspiracy with the Association or others to achieve an illegal restraint of trade, price-fixing, or other conduct condemned by the anti-trust statute, would plaintiffs have a cause of action. They submit no facts to support such a charge but rest their attack solely on the clauses in question. Contrariwise, the Union affirmatively, by affidavit of one of its officials, swears

17. 1945, 325 U.S. 797, 65 S.Ct. 1533, 89 L. Ed. 1939.

18. 1947, 330 U.S. 395, 67 S.Ct. 775, 91 L. Ed. 973.

19. United States v. Standard Ultramarine & Color Co., D.C.S.D.N.Y.1955, 137 F. Supp. 167, 174.

that the provisions were demanded for the purpose of protecting the interest of its members and to maintain and preserve desirable standards which were achieved only after a long struggle to overcome the known evils which had plagued the industry and its workers through the years.

Thus, with respect to each asserted cause of action there appears to be substantial doubt as to plaintiffs' legal position, assuming there were no factual dispute, which there is. Upon the record presented, the plaintiffs have not established that their right to ultimate relief is so clear as to entitle them in advance of trial, where factual and legal issues may be fully explored, to the drastic relief of an injunction.[20]

■ Neither have plaintiffs shown that irreparable injury will result if the hearing on the charges against them is permitted to proceed before the Impartial Chairman. First, there is no basis for assuming that a determination by him will be adverse to the plaintiffs. Second, in the event of an adverse award, since it is not self-executing, plaintiffs are free to oppose confirmation and to advance the contentions now urged in support of injunctive relief. Were they to appear before the Impartial Chairman, they could expressly reserve any claim of illegality of the contract provisions. Counsel for the defendants, upon the argument of the motion, stipulated that if plaintiffs participated in the hearing no claim of estoppel would be advanced by reason of such participation and that plaintiffs would be free to attack an award upon any application for its confirmation on the ground of illegality of the contract provisions.

■■ The relief asked here is an extraordinary remedy, it is governed by equitable considerations and is to be granted only in the exercise of sound discretion.[21] Equitable considerations also militate against the grant of the requested relief. The Court may balance the claimed irreparable injury to the plaintiff if the injunction is denied, against the injury likely to result to the defendants if it is granted.[22] Plaintiffs' claim of the alleged violation of section 302 arises, as the Court has already pointed out, because of plaintiffs' own violation of the collective bargaining agreement. Had there been compliance, there would be no basis upon which to attack the welfare fund provisions based upon the liquidated damage payments. Thus plaintiffs, by noncompliance with the terms of the agreement, have fashioned their own weapon of attack against the defendants. Moreover, on the very issues now posed by them, the Union, on at least four prior occasions, filed complaints against the plaintiffs with the Impartial Chairman. Plaintiffs at no time contended that the provisions were illegal until the present charge of keeping false books to conceal violations was made against them.

The granting of the requested injunction would interfere with an arbitration procedure which for many years has brought stability to this industry; it would tend to disrupt peaceful and harmonious relations which have existed between management and labor under the terms of prior and present agreements. Obviously an injunction which would have such far reaching and devastating consequences, should be granted only under the most compelling circumstances, when the right to ultimate relief is clear and there is a clear showing of irreparable injury. No such showing has been made.

■ Plaintiffs finally contend that the hearing should be stayed because there

20. Anderson-Friberg, Inc. v. Justin R. Clary & Son, D.C.S.D.N.Y.1951, 98 F. Supp. 75.

21. Cf. Whitehouse v. Illinois Cent. R. Co., 1955, 349 U.S. 366, 75 S.Ct. 845, 99 L. Ed. 1155; Anderson-Friberg, Inc. v. Justin R. Clary & Son, D.C.S.D.N.Y.1951, 98 F.Supp. 75.

22. Consolidated Canal Co. v. Mesa Canal Co., 1900, 177 U.S. 296, 302, 20 S.Ct. 628, 44 L.Ed. 777; Hamilton Watch Co. v. Benrus Watch Co., 2 Cir., 1953, 206° F.2d 738, 743.

is no arbitrable issue, since they have paid all amounts due under the contract. The Union disputes this, claiming that plaintiffs have concealed amounts due through the use of two sets of books, which in turn plaintiffs deny. Obviously, whether or not the correct amount due under the terms of the agreement has been paid is an arbitrable issue and entirely within the competence of the Impartial Chairman.

The motion for injunctive relief is denied.

Settle order on notice.