The **BARBIZON CORPORATION, Plaintiff,**

v.

**ILGWU NATIONAL RETIREMENT FUND, Sol C. Chaikin and Joseph Moore, Defendants.**

No. 85 Civ. 8822 (EW).

United States District Court,
S.D. New York.

Aug. 10, 1987.

Wimberly, Lawson, Cobb & Leggio, Atlanta, Ga., for plaintiff; James W. Wimberly, Jr., David F. Addleton, of counsel.

Arnold & Porter, Washington, D.C., K. Peter Schmidt, Philip W. Horton, of counsel, Booth, Marcus & Pierce, New York City, for defendants.

EDWARD WEINFELD, District Judge.

Plaintiff, The Barbizon Corporation ("Barbizon"), moves for summary judgment in this action for declaratory judgment arising under the Employee Retirement Income Security Act (ERISA)[1] as amended by the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA)[2] and the Deficit Reduction Act of 1984.[3] Defendants, the ILGWU National Retirement Fund ("the Fund") and its trustees, Sol C. Chaikin and Joseph Moore, assert a counterclaim for declaratory judgment and cross move for summary judgment. There being no genuine issue of material fact, the court finds summary judgment is appropriate and grants defendants' motion for the reasons stated herein.

BACKGROUND

Barbizon is a New York corporation engaged in the sale of finished garments. Barbizon, through its wholly owned subsidiary Barbizon of Utah, Inc., manufactured its finished garments at its plant in Provo, Utah.[4] The Provo factory produced over 90% of the garments sold by Barbizon.[5] On November 30, 1979, Barbizon informed its Provo employees that it planned to close

---

1. 29 U.S.C. § 1001 *et seq.*

2. Pub.L. No. 96–364, 94 Stat. 1208 (1980).

3. Pub.L. No. 98–369, 98 Stat. 494 (1984).

4. *See* Affidavit of Anthony B. Ritter, Aug. 21, 1986, at para. 2.

5. *See* Affidavit of Anthony B. Ritter, Aug. 13, 1986, at para. 16.

the Provo plant.[6] The plant was in fact closed prior to September 26, 1980.[7]

After the Provo plant closed, Barbizon switched to a system of garment production by outside contractors under which Barbizon supplied fabric to a contractor cutter who cut the fabric and shipped it to other contractors for final manufacture.[8] Barbizon continued to market the product lines it had formerly manufactured in Provo through a central inventory distribution facility that Barbizon established at its Pinebrook, New Jersey facility.[9] Barbizon did not change the trademarks or tradenames of any products or lines of products previously manufactured at the Provo plant, nor did it make any changes in the manner in which it marketed finished garments.[10]

Both before and after the closing of the Provo plant, Barbizon was a party to two successive master collective bargaining agreements with the International Ladies' Garment Workers' Union (ILGWU), one covering the period February 1, 1977 through January 31, 1980, and the other covering the period February 1, 1980 through January 31, 1983.[11] Under these collective bargaining agreements, Barbizon was required to make contributions to the defendant Fund on behalf of certain of its employees, including but not limited to employees at the Provo Plant.[12] Barbizon maintained a separate supplemental agreement with the ILGWU governing the Provo employees. When Barbizon decided to close the Provo plant, it negotiated and entered a separate supplemental agreement governing the closure.[13]

In January 1983, Barbizon permanently withdrew from the Fund's pension plan.[14] On June 17, 1983, the Fund demanded that Barbizon pay to the Fund the amount of $1,509,139 as withdrawal liability, payable in 55 quarterly installments.[15] Barbizon has made partial payment of the amount demanded under protest.[16] The parties agree that a substantial portion, if not all, of the withdrawal liability claimed by the Fund turns on the effect for liability purposes of Barbizon's termination of its operation in Provo.[17] Accordingly, Barbizon filed this action for declaratory judgment on the issue of its withdrawal liability attributable to the Provo plant.

## DISCUSSION

The parties appear to agree that the basic issue in the case is whether Barbizon's closing of its Provo plant was a closing of a facility within the meaning of 29 U.S.C. § 1397(a)(2) and whether there was a permanent cessation of an obligation to contribute under Barbizon's collective bargaining agreement within the meaning of 29 U.S.C. § 1397(a)(1).

When originally enacted in 1974, ERISA created a system of pension benefit insurance administered by the Pension Benefit Guarantee Corporation (PBGC).[18] Prior to the enactment of MPPAA, when a multiemployer pension plan terminated and there were unfunded vested benefits, the PBGC

---

6. See Joint Pretrial Order, Stipulated Facts Not in Dispute [hereinafter Stipulation] at para. 32.

7. See id. at para. 34.

8. See id. at para. 41. In the garment industry, one who has no direct means of production on premises and relies on outside contractors to produce goods is known as a "jobber." See Greenstein v. National Skirt & Sportswear Ass'n, Inc., 178 F.Supp. 681, 687 (S.D.N.Y.1959), appeal dismissed, 274 F.2d 430 (2d Cir.1960).

9. See Affidavit of Anthony B. Ritter, Aug. 13, 1986, at paras. 14–15. The Pinebrook facility was alternately known as the Montville facility. See id. at para. 5.

10. See Stipulation at paras. 44–45.

11. See Affidavit of Theodore Bernstein at para. 2.

12. See id. at para. 3.

13. See Complaint at paras. 21–22.

14. See Answer at para. 17; see also Stipulation at para. 42.

15. See Stipulation at para. 6; Exhibit 1 to Plaintiff's Motion for Summary Judgment.

16. See Stipulation at paras. 8–10.

17. See id. at para. 18.

18. See Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986).

assessed liability against employers who had participated in the plan within the past five years. This created an incentive for employers to withdraw from plans with unfunded benefits before they terminated. Such withdrawals weakened the plan, which increased the likelihood of termination, which increased the incentive to withdraw.[19]

Congress responded with MPPAA, which provides that an employer who withdraws from a plan must make annual payments to the plan to fund the employer's portion of the plan's unfunded vested benefits. This withdrawal liability is calculated in large part according to the employer's past contributions to the plan, including contributions made before the enactment of MPPAA.[20] Recognizing the potential unfairness of imposing liability retroactively for contributions made before MPPAA's passage, Congress created two exceptions to the general rules for calculating withdrawal liability: if an employer's obligation to contribute to a plan under a collective bargaining agreement ceased prior to MPPAA's enactment or if a facility closed prior to MPPAA's enactment, then Congress allowed the employer to exclude from the withdrawal liability calculation contributions attributable to that collective bargaining agreement or to work performed at that facility.[21]

There is no dispute that the Fund was a "multiemployer pension plan" as defined by 29 U.S.C. § 1002(37)(A),[22] or that Barbizon has withdrawn from the Fund,[23] or that "all covered operations permanently ceased" at the Provo plant prior to September 26, 1980.[24] The issue is whether the Provo plant was a "facility" within the meaning of the statute or alternately whether there was "a collective bargaining agreement for which there was a permanent cessation of the obligation to contribute" within the meaning of the statute.

Congress did not define the term "facility" in MPPAA. In an early draft of MPPAA, the House Ways and Means Committee defined "facility" to mean "an economic unit, generally at a single physical location, where business is conducted or industrial operations are performed."[25] However, this definition was dropped before the bill was enacted. The parties' attempts to ascribe meaning based on statements of members of the House and Senate fail since they shed little light on the issue and are statements made in context unrelated to the intended meaning of the term "facility."[26]

Barbizon would have the court interpret the term "facility" according to its "plain meaning" and conclude that a "facility" must be "located physically in space and time at a single location."[27] Barbizon

---

**19.** *See* H.R.Rep. No. 869, 96th Cong., 2d Sess., pt. 1, at 51, 54–55, 60, *reprinted in* 1980 U.S. Code Cong. & Admin. News 2918, 2919, 2922–23, 2928; *see generally Connolly,* 475 U.S. 211, 106 S.Ct. 1018.

**20.** *See* H.R.Rep. No. 869, 96th Cong., 2d Sess., pt. 1, at 77–78, *reprinted in* 1980 U.S. Code Cong. & Admin. News 2918, 2945–46.

**21.** For the purpose of determining the amount of unfunded vested benefits allocable to an employer for a partial or complete withdrawal from a plan which occurs after September 25, 1980, ... the amount of contributions, and the number of contribution base units, of such employer properly allocable—
(1) to work performed under a collective bargaining agreement for which there was a permanent cessation of the obligation to contribute before September 26, 1980, or
(2) to work performed at a facility at which all covered operations permanently ceased before September 26, 1980, or for which there

was a permanent cessation of the obligation to contribute before that date,
shall not be taken into account. 29 U.S.C. § 1397(a).

**22.** *See* Stipulation at para. 4.

**23.** *See id.* at para. 42.

**24.** *See id.* at paras. 34, 37.

**25.** H.R.Rep. No. 869, 96th Cong., 2d Sess., pt. 2, at 18 (1980), *reprinted in* 1980 U.S. Code Cong. & Admin. News 2993, 3007.

**26.** *See* Plaintiff's Memorandum in Support of its Motion for Summary Judgment at 22–23; Defendants' and Counterclaim Plaintiffs' Memorandum in Support of Motion for Summary Judgment at 14.

**27.** Plaintiff's Memorandum in Support of its Motion for Summary Judgment at para. 14.

finds support for its position in a case that holds that a branch of a chain of grocery stores is a facility within the meaning of the statute [28] and in opinions that hold that the term "facility" cannot mean all operations covered under a single collective bargaining agreement.[29]

These arguments miss the point of the Fund's claim, which is that shifting from one means of production to another should not excuse an employer from its liabilities to a pension plan. The Fund argues that shifting from direct production of garments in Provo to indirect production of garments in New Jersey without any reduction in business is not the kind of facility closing that Congress intended to excuse from withdrawal liability.

When Congress enacted MPPAA, the purpose of the withdrawal liability exceptions was to alleviate unfairness in imposing liability retroactively. If a discrete obligation to contribute to a plan, through a particular collective bargaining agreement or for a particular factory or store, had terminated prior to MPPAA's enactment, Congress thought it unfair to impose liability on an employer based on the past obligation. Absent the termination of such a discrete obligation to contribute to a plan, Congress made it clear that employers could not escape liability. Congress explicitly disallowed exclusion from liability "if a principal purpose of any transaction is to evade or avoid liability." [30]

In view of the purposes of MPPAA and the withdrawal liability exclusions, the court concludes that Congress did not intend the term "facility" to be interpreted simplistically as a physical plant. The definition supplied by the House Ways and Means committee was "an economic unit, *generally* at a single physical location." [31] Although a facility will often consist of a single physical plant, Congress clearly contemplated exceptions. One such exception would be where a plant merely moved across the street without ceasing business in any way. Another exception would be where an employer closes one plant and opens another because it has adopted a new method of production in order to escape responsibilities to employees.

The PBGC, the agency Congress created to administer the provisions of ERISA and MPPAA, has similarly concluded that although a facility will ordinarily mean a single physical location, "there may be circumstances under which the plan sponsor will determine that a shift of operations from one location to another constitutes a continuation of operations at the facility." [32] In addition, Arbitrator Robert E. Nagle, who was formerly Executive Director of the PBGC, also concluded that shifting operations from a plant in Philadelphia to a plant in New Jersey did not constitute the closing of a facility within the meaning of the statute.[33]

The garment industry has a unique history of shifting from direct production to indirect jobber status in order to avoid obligations to employees. In *Greenstein v. National Skirt & Sportswear Ass'n,*[34] this court discussed the nature of employment relationships in the garment industry. The system of manufacturing garments by outside contractors developed as a way to avoid workers' demands for better pay and working conditions at the turn of the centu-

**28.** *See Meatcutters Union Local No. 88 v. Del Monte Supermarkets,* 565 F.Supp. 27 (E.D.Mo.), *vacated on joint motion of parties,* 4 Employee Benefits Cas. (BNA) 2168 (8th Cir.1983).

**29.** *See Central Pennsylvania Teamsters Pension Fund v. Royal Swan Foods, Inc.,* No. 84–4163, slip op. (E.D.Pa. Sept. 19, 1985) [Available on WESTLAW, DCT database].

**30.** 29 U.S.C. § 1392(c).

**31.** H.R.Rep. No. 869, 96th Cong., 2d Sess., pt. 2, at 18 (1980), *reprinted in* 1980 U.S. Code Cong. & Admin. News, 2993, 3007 (emphasis added).

**32.** PBGC opinion letter No. 82–22 (Aug. 3, 1982); *see also* PBGC opinion letter No. 82–33 (Oct. 28, 1982).

**33.** *See Paperworkers Local 286 Pension Plan and Kardon Industries, Inc.,* 6 Employee Benefits Cas. (BNA) 2398, 2408 (Apr. 8, 1985) (Nagle, Arb.)

**34.** 178 F.Supp. 681 (S.D.N.Y.1959) (Weinfeld, J.), *appeal dismissed,* 274 F.2d 430 (2d Cir.1960).

ry. Because the jobber had no direct dealings with employees, it was not responsible to them for wages or working conditions. The unions, as well as enlightened leaders in the industry, sought to correct the demoralizing effects upon employees brought about by the jobber-contractor system. Collective bargaining agreements through the years have reflected not only a purpose to correct these conditions, but to prevent their recurrence.[35]

In light of this history, several courts have held that a jobber should be considered the employer of its contractors' employees.[36] Accordingly, in Barbizon's case, shifting to jobber status was no more than a continuation of the same business Barbizon had conducted in Provo. Closing the Provo plant and opening another in New Jersey to carry on the same business, was equivalent to the transaction at issue in *Paperworkers Local 286 Pension Plan and Kardon Industries, Inc.*[37] That transaction did not qualify as the closing of a facility within the meaning of MPPAA.

This interpretation of the term "facility" is consistent with other case law. In *Meatcutters Union Local No. 88 v. Del Monte Supermarkets*,[38] the court held that where an employer who owned four supermarkets closed two stores and did not open another for several years, there was a facility closing, even though all the stores operated under the same collective bargaining agreement. *Del Monte* differs from the case at bar because in *Del Monte* there was no evidence that the employer shifted its business from one location to another. In *Central Pennsylvania Teamsters Pension Fund v. Royal Swan Foods*, the court, in finding that one of two separate facilities had closed, relied on the fact that "[t]here was no significant shift of the Berwick

operation to Hazelton after the former location closed."[39]

▪ In deciding whether there has been a closing of a facility for purposes of § 1397(a)(2), courts should consider all the circumstances: whether a new plant has opened in the same line of business, whether the new plant continues to serve the same customers, whether the employer continues to use the same employees and equipment, whether the volume of business remains the same or has increased, and whether the employer's obligations to contribute under the plan remain the same. Where as here it appears that the employer has shifted its business to a new location with the same productive capacity, there is no facility closing as required under § 1397(a)(2). While in a literal sense Barbizon closed a facility, in fact it merely shifted the site of its operations.

Barbizon also argues that it should be relieved of withdrawal liability under § 1397(a)(1) because there was a permanent cessation of its obligation to contribute to the plan under a collective bargaining agreement. The collective bargaining agreement upon which Barbizon relies is the supplemental agreement entered with the ILGWU on June 24, 1980. Because that agreement terminated six days later on June 30, 1980, before the enactment of MPPAA, Barbizon argues that there was a permanent cessation of an obligation to contribute within the meaning of the statute.

The June 24th agreement that Barbizon relies on governed the closing of the Provo plant and specified such things as how vacation pay would be awarded to the terminated employees. The supplemental agreement specifies that Barbizon "shall continue to be liable for the contributions required to be made to the union benefit

---

35. *Id.* at 687–688.

36. *See ILGWU National Retirement Fund v. Distinctive Coat Co.,* No. 84–1758, slip op. at 10 (S.D.N.Y. Nov. 20, 1985) [Available on WESTLAW, DCT Database]; *Abeles v. Friedman,* 171 Misc. 1042, 14 N.Y.S.2d 252 (1939).

37. 6 Employee Benefits Cas. (BNA) 2398 (Apr. 8, 1985).

38. 565 F.Supp. 27 (E.D.Mo.), *vacated on joint motion of parties,* 4 Employee Benefits Cas. (BNA) 2168 (8th Cir.1983).

39. No. 84–4163, slip op. at 8, n. 2 (E.D.Pa. Sept. 19, 1985) [Available on WESTLAW, DCT Database].

funds pursuant to the collective bargaining agreement for the period up to June 30, 1980." [40] The collective bargaining agreement referred to in the June 24th agreement is the master agreement, in effect from February 1, 1980 through January 31, 1983.[41]

 Section 1397(a)(1) applies to "a collective bargaining agreement for which there was a permanent cessation of the obligation to contribute before September 26, 1980." In order for there to be a permanent cessation of an obligation to contribute under a collective bargaining agreement, the collective bargaining agreement must give rise to an obligation. Accordingly, § 1397(a)(1) only applies to collective bargaining agreements which establish an obligation to contribute.

The court concludes that, for purposes of § 1397(a)(1), the agreement under which the obligation to contribute arose is the master collective bargaining agreement in effect from February 1, 1980 through January 31, 1983. Under that agreement there was not a permanent cessation of the obligation to contribute to the Fund before September 26, 1980. Barbizon is therefore not entitled to reduce its withdrawal liability pursuant to § 1397(a)(1).

Barbizon also asks the court to stay its obligation to contribute to the Fund pending final resolution of this dispute, to order discovery of the Fund, and to award Barbizon exemplary damages, costs, and attorneys fees for the Fund's "willful or flagrant violation of a clear duty to Barbizon." In view of the court's determination of the parties' motions for summary judgment, plaintiff's motion to stay its obligation to contribute to the fund is denied. Any issues remaining about the amount of Barbizon's withdrawal liability are to be submitted to an arbitrator pursuant to 29 U.S.C. § 1401, including discovery issues. As for the request for exemplary damages, costs, and attorneys fees, that request is so

lacking in substance that it does not merit discussion.

So ordered.

---

**40.** Exhibit 14 to Plaintiff's Motion for Summary Judgment at 6.

**41.** Exhibit 31 to Plaintiff's Motion for Summary Judgment.