The BARBIZON CORPORATION, Plaintiff-Appellant,

v.

ILGWU NATIONAL RETIREMENT FUND, Sol C. Chaikin and Joseph Moore, Defendants-Appellees.

No. 622, Docket 87-7777.

United States Court of Appeals, Second Circuit.

Argued Jan. 20, 1988.

Decided March 18, 1988.

James W. Wimberly, Jr., Atlanta, Ga. (Wimberly, Lawson, Cobb & Leggio, Atlanta, Ga., Evan J. Spelfogel, Summit, Rovins & Feldesman, New York City, of counsel), for plaintiff-appellant.

K. Peter Schmidt, Washington, D.C. (Philip W. Horton, Arnold & Porter, Washington, D.C., Marc E. Richards, Booth, Marcus & Pierce, New York City, of counsel), for defendants-appellees.

Before LUMBARD, KEARSE, and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

This case presents a challenge by appellant The Barbizon Corporation ("Barbizon") to a determination of its liability to contribute to appellee the ILGWU National Retirement Fund (the "Fund"). Appellees Sol C. Chaikin and Joseph Moore are officers of the Fund and members of its Board of Trustees. Barbizon appeals from a judgment of the United States District Court for the Southern District of New York, Edward Weinfeld, Judge, entered upon a decision, reported at 667 F.Supp. 994, that denied appellant's motion for summary judgment and granted appellees' cross-motion for summary judgment. We agree with the district court that Barbizon is liable for its assessed share of the unfunded vested benefits in the pension plan, and we therefore affirm.

## BACKGROUND

The Fund is a multiemployer pension plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, as modified by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), Pub.L. No. 96–364, 94 Stat. 1208. *See* 29 U.S.C. §§ 1002(37), 1301(a)(3) (1982). The Fund provides retirement and other benefits for workers in the garment industry.

Barbizon is a New York corporation engaged in the design and sale of finished garments. Until approximately June 30, 1980, Barbizon, through its wholly-owned subsidiary, Barbizon of Utah, Inc., manufactured most of its finished garments at a plant in Provo, Utah; it also operated a wholesale distribution center at Montville, New Jersey. Barbizon's garment workers were employed pursuant to successive master collective bargaining agreements between Barbizon and the International Ladies Garment Workers Union (the "Union"), which were supplemented by separate agreements covering the employees at Provo and Montville, respectively. Under the master agreements, Barbizon was obliged to contribute to the Fund on behalf of the unionized employees working both at Provo and at Montville. The labor agreements also provided that if Barbizon contracted with other companies to perform any of its production work, with a few limited exceptions, it would only engage the services of companies that also employed workers represented by the Union.

Barbizon was also required to contribute to the Fund on behalf of the contractors' employees with respect to any such subcontracted work.

On or about June 30, 1980, Barbizon closed its Provo, Utah plant and terminated the employment of its workers at that location pursuant to a supplementary collective bargaining agreement dated June 24, 1980 that it had negotiated with the Union (the "Termination Agreement"). The work that previously had been performed at Provo was thereafter performed by independent contractors to Barbizon's specifications with fabric supplied by Barbizon; in some instances, Barbizon sold or lent to these contractors some of the specially-designed equipment that it had used previously at the Provo plant. Barbizon did not discontinue any of its product lines, alter any trademarks, or modify its marketing procedures as a result of closing the Provo plant. And as Barbizon's counsel conceded at oral argument, it did not lose any productive capacity or suffer any diminution of sales, either.

In January 1983, Barbizon withdrew from the Fund within the meaning of the MPPAA, and in June 1983, the Fund assessed Barbizon's withdrawal liability, as required by the MPPAA, *see* ERISA §§ 4201–4225, 29 U.S.C. §§ 1381–1405 (1982 & Supp. III 1985). In essence, the statute requires an employer that withdraws from a multiemployer pension plan to "pay a fixed and certain debt to the pension plan," which represents "the employer's proportionate share of the fund's 'unfunded vested benefits,' calculated as the difference between the present value of vested benefits and the current value of the plan's assets." *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725, 104 S.Ct. 2709, 2715, 81 L.Ed.2d 601 (1984) (citing 29 U.S.C. §§ 1381, 1391); *see generally Barbizon Corp. v. ILGWU National Retirement Fund*, 667 F.Supp. at 996–97 (describing purpose of MPPAA). The proportion for which the employer is liable is determined primarily by reference to the extent of the employer's prior participation in the pension plan. *See* 29 U.S.C. § 1391 (1982 & Supp. III 1985); *see gener-*

*ally Peick v. Pension Benefit Guaranty Corp.*, 724 F.2d 1247, 1255–56 (7th Cir. 1983) (describing MPPAA and its effect on prior ERISA requirements), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984). However, in calculating the employer's withdrawal liability, the plan sponsor must exclude from the employer's contribution base, upon which the withdrawal liability is determined, any contributions attributable to work performed at a facility where all covered operations ceased prior to September 26, 1980 (the effective date of the MPPAA, *see* Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494), or to work performed either at a facility or under a collective bargaining agreement for which there was a permanent cessation of the obligation to contribute prior to that date. ERISA § 4217(a), 29 U.S.C. § 1397(a) (Supp. III 1985).

The Fund assessed Barbizon's withdrawal liability at an amount in excess of $1.5 million, which was calculated without excluding contributions attributable to the Provo plant. The Fund's entitlement to collect this withdrawal liability was dependent substantially upon the nonavailability of any § 4217 exclusion arising from Barbizon's termination of its Provo operations. Barbizon claims to be entitled to such an exclusion because of the closure of its Provo plant prior to September 26, 1980, pursuant to the Termination Agreement with the Union.

Under protest, Barbizon paid substantially all of the assessed liability and, in November 1985, instituted a declaratory judgment action in the United States District Court for the Southern District of New York, seeking to have the liability assessment set aside and recalculated after excluding any portion attributable to contributions made for work that had been performed at the Provo plant. The Fund counterclaimed for a declaratory judgment that the withdrawal liability assessed was payable in full. The parties entered a joint pre-trial order of stipulated facts in August 1986, and shortly thereafter cross-moved for summary judgment. Judge Weinfeld heard oral arguments on the motions in

October 1986, and on August 10, 1987, he rendered a decision, reported at 667 F.Supp. 994, denying Barbizon's motion and granting the Fund's cross-motion. Judgment was thereafter entered dismissing Barbizon's complaint, and this appeal followed.

The issue presented in this case is whether the conditions for application of § 4217 of ERISA required the Fund to exclude Barbizon's contributions with respect to the Provo plant when it calculated Barbizon's withdrawal liability. We conclude that the requirements of § 4217 were not met and that the Provo contributions therefore were properly included when Barbizon's liability was determined.

## DISCUSSION

Section 4217 of ERISA, 29 U.S.C. § 1397 (Supp. III 1985), as amended, reads in pertinent part as follows:

> (a) For the purpose of determining the amount of unfunded vested benefits allocable to an employer for a partial or complete withdrawal from a plan which occurs after September 25, 1980, and for the purpose of determining whether there has been a partial withdrawal after such date, the amount of contributions, and the number of contribution base units, of such employer properly allocable—
>
> > (1) to work performed under a collective bargaining agreement for which there was a permanent cessation of the obligation to contribute before September 26, 1980, or
> >
> > (2) to work performed at a facility at which all covered operations permanently ceased before September 26, 1980, or for which there was a permanent cessation of the obligation to contribute before that date,
>
> shall not be taken into account.

### A. *Subsection (a)(1)*

Barbizon notes that its obligation to contribute to the Fund with respect to work performed at Provo ceased on June 30, 1980 pursuant to the June 24, 1980 Termination Agreement with the Union. It therefore claims to be entitled to an exclusion under subsection (a)(1) on the ground that, before September 26, 1980, "there was a permanent cessation of the obligation to contribute" to the Fund with respect "to work performed under a collective bargaining agreement." We disagree.

The term "obligation to contribute" is defined in § 4212(a)(1), 29 U.S.C. § 1392(a)(1) (1982), as one arising "under one or more collective bargaining (or related) agreements." As we read § 4217(a)(1) in light of this definition, we conclude that the requisite cessation of the obligation to contribute must be coextensive with the duty to contribute; only if the obligation to contribute is entirely extinguished will this exclusion apply. We agree with Barbizon that the collective bargaining *agreement* under which the contributory obligation arose need not terminate before the subsection (a)(1) exemption will apply. *See United Food & Comm'l Workers Int'l Union–Ind. Pension Fund v. G. Bartusch Packing Corp.*, 546 F.Supp. 852, 856–57 & n. 7 (D.Minn.1982) (employer's obligation to contribute held to have permanently ceased approximately one month after company permanently laid off all employees, since labor contract provided that contributions were to be made only for those employees who worked a minimum number of hours in any given month). However, the *duty to contribute* that arose from that agreement must terminate before an employer qualifies for the subsection (a)(1) exclusion.

Although Barbizon ceased to have an obligation under the applicable master agreement to contribute for the Provo plant after June 30, 1980, the Termination Agreement did not alter Barbizon's ongoing obligation to make payments for whatever contributory operations it continued to engage in. Thus, under the master agreement it remained bound to contribute on behalf of its employees at Montville, New Jersey, and with respect to work performed by outside contractors. Its unitary obligation to contribute did not cease; the operations for which it contributed were merely modified when it was relieved of any further obligation with respect to the

Provo plant. Had Barbizon maintained an entirely separate collective bargaining agreement relating exclusively to Provo, rather than a master agreement covering multiple operations, we might have been persuaded to resolve this issue differently. But upon the facts presented, the requirements of subsection (a)(1) were not met.

B. *Subsection (a)(2)*

Barbizon next asserts that because the Provo plant was closed and all covered operations at that location ceased prior to September 26, 1980, it is therefore entitled to the "facility closing" exemption of subsection (a)(2). It further contends that under the June 24 Termination Agreement, its obligation to contribute to the Fund with respect to work performed at Provo also ceased before the effective date of the MPPAA. In either event, it claims to be entitled to relief under subsection (a)(2).

Unless the Provo plant was a "facility" within the meaning of the statute, Barbizon is not entitled to the benefits of subsection (a)(2). Although the term is not defined in the statute itself or in any applicable regulations, some guidance is provided by the definition originally included in the bill that eventually became the MPPAA. That bill defined "facility" as "an economic unit, *generally* at a single physical location, where business is conducted or industrial operations are performed." H.R.Rep. No. 869, 96th Cong., 2d Sess., pt. 2, at 18 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 2918, 2993, 3007 (emphasis added). However, this definition was withdrawn before the bill was passed, so it is not controlling. Nevertheless, it is a useful starting point.

Lacking any clear statutory or administrative definition of "facility," we are entitled to look to the ordinary meaning of the term. *United Technologies Corp. v. OSHA*, 836 F.2d 52 (2d Cir.1987). This approach has previously been used in order to construe the word "facility" in § 4217. *See United Mine Workers 1974 Pension Plan v. Williamson Shaft Constr. Co.*, 6 Employee Benefits Cas. (BNA) 1593, 1603 (Jan. 29, 1985) (Pritzker, Arb.); *see also*

*May Stern & Co. v. Western Pennsylvania Teamsters & Empl. Pension Fund,* 8 Employee Benefits Cas. (BNA) 2205, 2215 (Apr. 16, 1987) (Nagle, Arb.). According to one standard definition, a "facility" is "something (as a hospital, machinery, plumbing) that is built, constructed, installed, or *established to perform some particular function* or facilitate some particular end." *Webster's Third New Int'l Dictionary* 812–13 (1981) (emphasis added). This definition is consistent with the approach taken by Congress in the proposed definition described above and with the interpretation offered by the Pension Benefit Guaranty Corporation of the Department of Labor ("PBGC"), which is responsible for insuring multiemployer pension plans. *See* PBGC Op.Ltr. 86–2 (Jan. 31, 1986) (looking to "generally accepted economic terminology" and to "commonly used meaning" to interpret the term "facility" as "a discrete economic unit of an employer").

In most instances, as Barbizon argues, individual stores, warehouses, or centers of business operations will constitute separate facilities within the meaning of § 4217. *See, e.g., May Stern & Co.,* 8 Employee Benefits Cas. at 2215 (warehouse is facility); *Meatcutters Union Local 88 v. Del Monte Supermarkets,* 565 F.Supp. 27, 29 (E.D.Mo.1983) (individual stores in supermarket chain are facilities), *vacated on joint motion of parties,* 4 Employee Benefits Cas. (BNA) 2168 (8th Cir.1983); *see also* PBGC Op.Ltr. 86–2, *supra* (same); PBGC Op.Ltr. 82–33 (Oct. 28, 1982) (same). However, the term is not meant to be applied mechanically to every physically separate structure, since it is intended to refer to a readily identifiable and discrete segment of the employer's business—what the PBGC called "a discrete economic unit." *See* PBGC Op.Ltr. 86–2, *supra.* Frequently, this business segment will correspond to a factory, plant or store.

Yet, the PBGC has consistently noted that "there may be circumstances in which the plan sponsor may determine that a shift in operations from one location to another constitutes a continuation of operations at a facility." PBGC Op.Ltr. 85–1 (Jan. 4, 1985); PBGC Op.Ltr. 82–33, *supra;*

*see also* PBGC Op.Ltr. 85–22 (Aug. 3, 1982) (same, in context of § 4205, 29 U.S.C. § 1385). Indeed, this rationale has been applied to deny a § 4217 exemption to a company that closed a plant in one state and moved a few miles away into another state, without discontinuing any of its productive operations. *See Paperworkers Local 286 Pension Plan v. Kardon Indus.*, 6 Employee Benefits Cas. (BNA) 2398, 2408 (Apr. 8, 1985) (Nagle, Arb.); *cf. May Stern & Co.*, 8 Employee Benefits Cas. at 2215 (company qualified under § 4217 because "[t]here is no suggestion that the covered work performed at a closed facility was simply transferred to another facility"). This approach is consistent both with the proposed congressional definition of a "facility" as something that is only "generally" at a single location, and with the dictionary definition of the term, which examines the function or operation being performed.

■ The "facility" at issue herein consists of more than the Provo plant itself: it is that portion of Barbizon's business which was composed of the productive operations that were formerly performed by the workers at the Provo plant and that, after June 30, 1980, were performed by outside contractors. *See also Central Pennsylvania Teamsters Pension Fund v. Royal Swan Foods, Inc.*, No. 84–4163, slip op. at 7 (E.D.Pa. Sept. 19, 1985 [available on WESTLAW, 1985 WL 2802] ("the primary focus should be on the employer's business and the relationship of the 'facility' to that business;" looking to factors such as the type of work performed to determine whether operations at two physical locations were part of same facility). Although Barbizon closed its physical plant and terminated the employment of its Provo-based workers, it did not lose any productive capacity in the process. From a functional perspective, Barbizon's shift in manufacturing technique did not remove any productive operations from the coverage of the pension plan. *See Paperworkers Pension Plan*, 6 Employee Benefits Cas. at 2408. Its conduct did not involve the mere retention of a few employees for the purpose of winding down a business operation, *cf. Connors v. Economy Bld'g Sys., Inc.*,

651 F.Supp. 849, 853 (D.D.C.1986); rather, it amounted to a continuation of the same business with a modified method of production. Consequently, we conclude that there was no permanent cessation of "covered operations" at the "facility."

■ Section 4217(a)(2) also requires the Provo contributions to be excluded from Barbizon's contribution base if there was a permanent cessation, prior to September 26, 1980, of the obligation to contribute for work performed at the Provo facility. Although Barbizon did benefit from a reduction in the amount of contributions that it paid to the Fund after closing the Provo plant, it does not deny that it continued to make contributions on behalf of the employees of at least some of the subcontractors that performed the work previously done by Barbizon's own employees at Provo. Indeed, as discussed *supra* in the context of subsection (a)(1) of the statute, Barbizon had a continuing obligation under the master collective bargaining agreement to make such contributions. Since the work produced by the subcontractors was the same as that formerly produced at Provo, it was the product of the same "facility." And since Barbizon had a duty to contribute to the Fund with respect to work performed by some of these subcontractors, there was no "permanent cessation of the obligation to contribute." Barbizon therefore does not qualify for the second part of the subsection (a)(2) exemption, either.

In short, we find that Barbizon had a unitary obligation to contribute to the Fund, which arose under the master collective bargaining agreement, and which was not terminated by the June 24, 1980 agreement negotiated with the Union regarding the closure of the Provo plant. Furthermore, there was no cessation of covered operations at the Provo facility because Barbizon experienced no reduction in its productive operations as a result of the plant closure, and since the work formerly performed at Provo continued to be performed, albeit by different means. And since Barbizon was contractually required to and did indeed make contributions with respect to some of this continued produc-

tion, there was no permanent cessation of the obligation to contribute. Barbizon was therefore ineligible for any exclusion under § 4217, and the judgment of the district court is therefore affirmed.